It's appeal number 22-27-73. Mr. Nobresky, good morning. Good morning, Your Honors. May it please the Court, my name is Attorney Brad Nobresky, representing Mr. Osterman. We are requesting the reversal of the District Court's decision that the false statements and omissions in the warrant application and the affidavit were not the product of a reckless disregard for the truth and, separately, that their false statements and omissions were not material to the probable cause determination. Simply put, Judge Griesbach got this wrong. There was clear error in this case in two specific regards. First, the District Court's decision is inconsistent with this Court's recent opinion, that being in Taylor v. Hughes, which came out January 2022, which I believe Judge Scudder, you authored. The second being that the Court's analysis, both as to the recklessness of the false statements and then the probable cause determination or the analysis of probable cause, that kind of factored into whether these were material statements, relied heavily on testimony of the officer during the Franks hearing of facts that were subsequently learned or information that the officer testified that he was aware of but did not include in the warrant affidavit. So, essentially, information that was outside of the four corners of the affidavit presented to the magistrate judge. First, let me kind of get into the two false statements or the false statement and the omission. Paragraph 12 of the affidavit is the one that was most heavily focused on, both in our briefing and in the Franks hearing. This was the assertion that an unknown individual, going by the alias Brad Jones, on a social media app called Meet Me, was communicating with the juvenile victim of child sex trafficking, essentially, using the public Wi-Fi of the Holiday Inn Hotel in Hillside on, I believe it was July 4th of 2020. That is false. At no point was Brad Jones using that Wi-Fi network to communicate with the juvenile victim. Included with that was a statement that Mr. Osterman checked into the hotel the next day, July 5th. That is true. This is material because other than the Brad Jones using the Hillside Wi-Fi statement, there is no connection to Mr. Osterman in this investigation that is not related to just his ownership of an Internet company. He had previously been interviewed by the officers, not as a suspect, just as they went to to see, okay, can we figure out who's using this network? Paragraph 12 was the link to him as a suspect, and that is something that the officer himself testified to. The second paragraph is paragraph 13. This is an omission, essentially, that law enforcement, let me rephrase, throughout the affidavit, each of the cyber tip line reports that are discussed end with the statement that we are unable to identify who the individual responsible for this is. Paragraph 13 discusses the eighth of the cyber tip line reports. At the time that the affidavit was sworn out, law enforcement had records from the National Center for Missing and Exploited Children identifying the subject in that as an individual who lived in Texas, Belinda Contreras, who presumably traveled to Rylander and had engaged in this communication from a public Wi-Fi address that also was used in other reports. So the kind of underlying inference that is pushed throughout the affidavit that all of these communications must be from one individual because of the similarity of the language used, the similarity of the public Wi-Fi locations, and just Rylander being a relatively remote area, the officer asserted repeatedly, okay, it's got to be one person and likely someone living in Rylander. He knew, or law enforcement broadly knew, actually one person from Texas was responsible for that. Well, let me ask you about this because I do see where counsel asked, and I don't know if it was you or another lawyer, Detective Wanta, about this at the Franks hearing. Correct. Did you raise this in the motion to suppress? So prior counsel did not explicitly identify paragraph 13. Why that was I do not know, but it was testified about. There were questions raised. So if nothing else, if the court does not want to address that as a claim that we're raising because it was not raised below, we can look at it as evidence of state of mind in terms of the recklessness of another instance of an officer including a false statement despite having the correct information available to them. Can the district court's decision be fairly read as a decision about Agent Wanta's lack of intentional or knowing or reckless conduct writ large because the district court says based on the evidence presented to me and the review of the record, and of course this was evidence that came out at the Franks hearing, or not because it was not raised in the motion to suppress, and I don't see where the government responded to it. I don't see a specific reference to paragraph 13 in the district court order. That is fair. There was no specific reference in the court order. The court, having heard the testimony, did not do anything with it, did not address it. For what reason, I cannot be sure. Okay. We highlight both of those paragraphs because this case is essentially extremely similar if not worse than the facts in Taylor v. Hughes. In Taylor we had the officer essentially make up out of whole cloth the unit number of an apartment in a four apartment building. He said he just guessed he could have verified it at any point but did not do so. In that case this court called it an open and shut Franks violation, went so far as to not only reverse but enter summary judgment for the plaintiff. This fact pattern is really in all ways it is identical if not worse. We have an officer who not only included false statements in the warrant affidavit and failed to corroborate them or investigate them more already and testify that he did not review it very closely because it was out of his jurisdiction. He did not think he would be investigating the Illinois part. Our position is essentially at the point that he decided he was going to swear to these facts, he had an obligation to ensure that the facts were true and he cannot just throw his hands up as an officer and say, well, I did not look very closely at it because it was outside of my jurisdiction. Like in Taylor, this was essentially made up. This was something that he believed to be true. Why he believed that despite having reviewed records that disproved it, I do not know. He admitted it was inadvertence. He believed it to be true and kind of made efforts to explain away his lack of reviewing the records before him in a more clear way. The government kind of responds that this is closer to Gregory. And just to address that point, Gregory did not involve factual statements that were false. Gregory, the officers provided detailed information about the target's electrical consumption at their homes and then statewide averages because they were unable to get local averages. The falsity I guess was the inference to be drawn from that because statewide average was four times lower than this household so the government said, well, we can look at that and believe that a grow operation is happening here because of power consumption. In fact, the electrical consumption at the houses was in line with local power consumption. The officers had attempted to get that information and were kind of, the subpoena wasn't responding. So they had factually true information and just kind of went down an inferential road that turned out not to be true. Compared to this case and Taylor in which case, it's just plainly false. The statements are false. They are untrue. Efforts were not taken to corroborate them and in this case they had the evidence in front of them to have true statements. Mr. Nebreska, we're going to give you a couple minutes for rebuttal so don't worry about that. The one point you made earlier about once you go through, you look at paragraph 12 and you identify, I think there's any question you're right that there's misstatements in paragraph 12. I don't think there's any doubt about that. You said that's basically it. The reason I pause on that and would benefit from your reaction to is the information in paragraph 16 seems important to me. Paragraph 16 is where your client was found sitting in his truck outside that laundromat in Rhinelander for quite a time and some of those cyber tips, do they not, were showing IP addresses that linked to that same vicinity in Rhinelander. So the reason I'm asking you that question is some of this starts to, we have to ask a probable cause question. We're not doing it beyond a reasonable doubt. And that's not a great fact for your client. Correct. And my response to that would essentially be that this is a small community. He owns an internet provider in the area and was testing competitor speeds and the cyber tips don't match up date time-wise with the police encountering him there. So also absent that context, it also kind of paints a picture that isn't necessarily... No, they don't match up. I mean, that's his explanation, but in the grand scheme of the investigation, there's nothing that compels law enforcement to credit it. Correct. Absent paragraph 12, I think we can look at that as a fairly benign encounter with police. They had previously spoken with Mr. Osterman investigating just who on the internet he addresses and kind of had knowledge of him and just familiarity with him to begin with. So in that context, I think it is really benign that they had an encounter in the parking lot with him testing internet speeds. Once we kind of take out any link to the actual investigation being had. Okay. We'll give you a couple minutes on rebuttal. Thank you. I appreciate that. Yeah, you're quite welcome. Okay. Mr. Koenig, nice to see you. Good morning. Good morning. Nice to see all of you as well. My name is Jonathan Koenig and I appear this morning on behalf of the United States. We ask that you affirm Judge Griesbach's denial of Mr. Osterman's suppression motion. When a defendant invokes the exclusionary rule under Frank's, he has to show two things. First, that the affiant intentionally misled the issuing court or had reckless disregard for the truth. And second, that the omission or false statement in the affidavit was material to the court's probable cause determination. Osterman's motion and likewise his appeal fail on that first point because there is respectfully no evidence of intentional or reckless conduct. What do you call learning, I'm talking about paragraph 13 right now, shortly after Detective Contreras for this particular cyber tip. So they're not all Mr. Osterman and he never updates that particular paragraph, though he knows, and he testified at the Frank's hearing, he knows it's wrong at this point. How is that, explain to me how that's not reckless. You asked me what I would call it. I would call it careless, Your Honor, and obviously there's a line somewhere between negligence and recklessness. We don't think it was crossed in this particular case. We could probably all think of examples. No, no. I think we've said something different. I'm looking at Becker v. Gomez. Reckless disregard for the truth occurs when an officer entertains serious doubts as to the truth of the statement or had obvious reasons to doubt their accuracy. Well, but it's a subjective inquiry and his testimony, as I recall, his testimony was he was flooded with these cyber tips. He didn't take the step of going through. No, that was his testimony for paragraph 12. For paragraph 13. My recollection, Your Honor, was that he testified that he merely kept the paragraph in without going back to review whether anything had happened in the interim to call into question the accuracy of what was already in the template. So I hope I'm answering your question as honestly as I can, which is to say this was careless. Now, what would be reckless? Reckless would be, you know, the agent has evidence that the suspect was in a coma during the relevant time frame and that doesn't end up in the affidavit. Or he plays eenie, meenie, miney, moe, eenie, meenie, miney, moe, with the defendant's address, which is what happened in the Taylor v. Hughes case, or injects facts that are non-existent, which also happened in the Taylor v. Hughes case, where the agent added some facts about drug use or drugs that just simply were not present. That would be reckless or intentional, I would submit. Yeah, I mean, this is pretty sloppy. I mean, it ain't good. I'm not disputing that, especially with respect to paragraph 13. I got a question. I got two factual questions that you can help with. Yes. Okay. In your red brief on page 6, do you have it there? I mean, I know this is detailed. I apologize. I wouldn't be asking if it wasn't important. At the very top of page 6, you a series of chats over meetme.com between the individual, right, and that encounter that occurred on July 4th and July 5th. What's the evidence that those communications relating to the July 4 and July 5 encounter originated in the vicinity of Rhinelander? I can't find that. You know what that is? As I stand here, Your Honor, I can try to ascertain and submit a follow-up. Okay. My second question is this. You might think this is irrelevant. There seems to be a real time disconnect here. How did the evidence that was obtained as a result of the search warrant, search warrant was to put the GPS device on the truck, right? Presumably that happened and it yielded some GPS information. Yes. Okay. How did that relate to the crime to which the defendant pled guilty to? Because I understand the crime that he pled guilty to to relate to the July 4 or 5 assault of the minor in the Chicagoland area, correct? That is all. The GPS information has nothing to do with that. By definition, it can't be directly related. By definition, it doesn't. So what are we, does this impression relate to anything? Well, I think to be, that's an excellent question, but to be fair to my opponent, I think the answer is that there were some other investigations going on at the state level and the GPS tracking information became relevant in those investigations and could potentially have been 404B evidence at our case going to trial federally. So I'm just 404B in the sense that did the GPS data put him back at that laundromat in other places like that? No, as I understand it, they were sting operations and I don't know the details and maybe it had something to do with that. So there's no standing problem here? There just is a real disconnect between, okay, let's go ahead and suppress the warrant, suppress the evidence yielded by the warrant, but it is what he pled guilty to. I agree with you and respectfully, I'm not trying to dodge your question, but it's really a question for my opponent. Well, no, I'll ask him. The only reason I'm asking you is because you've been with the case a while. That's right. Let me just say your understanding of the chronology is correct. I have not heard, we did have a footnote in our brief about this. I have not heard a response from Osterman as to what difference any of this makes. Right, but when this all came up in the district court, I don't know if it was you or one of your colleagues, but did the government stand in front of the district court and say, this motion to suppress has nothing to do with the federal case? No, I don't think so. It may have something to do with the state case or other cases, but it has nothing to do with this. I don't believe we raised that objection at that time. Okay. Okay. Mr. Osterman, though, was referred for federal prosecution and the state cases were dismissed, right? That's correct. That's what I gleaned from the record. That's correct. Okay, so there was some sort of agreement or... What is sometimes called a global resolution, yes, Your Honor. Yes. This case turns on the first part of the Frank's analysis, and that is, as I started to say, whether there was misleading or reckless conduct. The experienced district judge in the case heard evidence and concluded unambiguously and without any limitation that he found Sergeant Wanta credible. And Wanta's testimonial was that the problems with paragraphs 12 and 13 were due to inadvertence or carelessness. So the judge's finding in this context is entitled to considerable deference. The question is not whether we agree necessarily or you agree, but whether you're left with a definite and firm view. But, you know, the judge does make a sweeping conclusion. He says, based on the evidence presented in my review of the warrant affidavit, I find that Sergeant Wanta did not knowingly, intentionally, or with reckless disregard for the truth include a false statement in his search warrant affidavit. That would seem to me to sweep up any problems with both paragraph 12 and paragraph 13. What's your reaction? I would agree. And if I may, I'd like to talk a little bit about paragraph 12. I agree that I think it was bungled would be the right way to put it. Because the wording suggests that all of the messaging on July 4th and July 5th took place from this Holiday Inn Express location. And that is not true. And so in that sense, paragraph 12 is false. Okay? Sorry, go ahead. No, no. I think there seems to be agreement on that narrow point you just made. So let me just ask you while we have time about something else. You know, this idea that Brad Jones connected to Wi-Fi hotspots in Antigua, Wisconsin, and in Gurney, Illinois, that was not included in the original affidavit. So what was the district court judge doing, relying on that? That didn't go to Wanta's state of mind at all, which would have been permissible, you know, evidence outside for that purpose. That went to the whole probable cause. But it did go to his state of mind. Why would – it makes more sense that he overlooked this than that he deliberately left it out, because it actually helps the government. It shows a progression from north to south, from Wisconsin to Illinois. All those little details were not exculpatory at all. They would have helped the government. I thought his point about overlooking was just that, you know, I was inundated with – I got a lot of paper with these cyber tips. It's not a question of whether it would help the government or not. So now are you making a new argument on behalf of Detective Wanta? No, I'm suggesting that – I just don't see how it goes to Detective Wanta's state of mind, as opposed to just being something that's outside the affidavit that the judge should not have mentioned. Sure. Could I briefly answer, Your Honor? I would just suggest that the omission here is more suggestive of an oversight or a mistake than anything else, because if those details that you were just talking about had been included, they would have helped the government. And I think that's why Judge Griesbach was talking about them. He did not explicitly say what I just said. But that's my reading of his order, is that, hey, you know, there's nothing nefarious going on here. And as I say, the whole thing, from the government's perspective, does turn on that credibility finding. So we would ask you to affirm on that basis. Okay. Mr. Koenig, thank you very much. Thank you. Mr. Nabreski, I'll give you a couple minutes as promised there. Thank you, Your Honors. I'll kind of jump into the various questions that were raised. Just as a quick point, the Wanta credibility finding is interesting because Wanta also conceded the materiality of Paragraph 12, plain and simple. So to credit his, I guess, credibility as reason to believe his self-serving statement that it was just inadvertence and not recklessness, while also discrediting it when it came to the materiality of Paragraph 12, seems a bit serving the interests of the end resultant and not an accurate deference, I guess, to his credibility. Also, Detective Wanta testified at the Franks hearing that he did intend the paragraph to read that all of the communications between Brad Jones and juvenile victim occurred at the hotel. That is what he believed happened. We know that's not correct. It wasn't the case that he didn't mean that and just worded it in a way that read that way. He simply thought that all of it took place at the hotel when, in fact, none of it took place at the hotel. On the issue of, okay, what does suppression do for us here? Why is this important? Arguably, if this wasn't important, the government wouldn't be here fighting this fight. They would have conceded to not use any of the GPS data in the federal prosecution if it went forward. The bigger picture is that this would come in as evidence that was gained as a result of the GPS led to several state charges, but also led to other acts that would be admissible in the federal prosecution for this child sex trafficking that would essentially make prosecuting the case and defending the case look very different than if that was all left out and we were just left with the facts surrounding the actual indicted charge. Okay. Let me make sure. Your representation from what you know about the case is that the GPS warrant did yield evidence, information that the government was going to use in its case in chief had the case gone to trial. Correct, or could have definitely used. We don't know since it was in a plea posture by the end of this whether they would have, but it would be very odd for them not to. It was inculpatory other acts evidence essentially that was gleaned from the six months of GPS tracking. Okay. All right. And I see I'm out of time, so if there are no more questions, thank you. I would ask for reversal on both of the bases that I elaborated on. Okay. You're quite welcome. Thanks to you. Mr. Koenig, thanks to you as well. We'll take the case under advisement and we'll move to.